## A00A0810. BURGESS v. COCA-COLA COMPANY.
(536 SE2d 764)

ELLINGTON, Judge.

Robert L. Burgess sued The Coca-Cola Company ("Coca-Cola") for allegedly taking his creative ideas and using them in a commercial that featured anthropomorphic polar bears drinking Coca-Cola. Burgess sought recovery under theories of misappropriation of ideas, breach of express and implied contract, breach of a confidential relationship, unjust enrichment, quantum meruit, and promissory estoppel. After two years of discovery during which over thirty-five people were deposed, Coca-Cola moved for summary judgment. Following a lengthy hearing, the trial court granted Coca-Cola's motion. For the following reasons, we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). Our review is de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

Viewed in this light, the record reveals that Burgess approached Coca-Cola in January 1989 to pitch a creative concept he referred to as "The Fantastic World of Coca-Cola." There is no evidence that Coca-Cola agreed to compensate Burgess for the disclosure of his idea prior to his pitching it for the first time to Coca-Cola executive John B. White. The presentation included seven storyboards which depicted various aspects of the concept. This "Fantastic World," as Burgess explained, was an imaginary world located inside a Coca-Cola vending machine and populated with a wide variety of Coca-Cola characters, including, as shown by one of the storyboards, a family of white teddy bear-like "cola bears" making ice to cool the Coca-Cola. Burgess also provided White with a written narrative of his concept. This first narrative did not mention bears. White told Burgess he was not in a position to help him. However, believing the concept might be suitable for a toy line, White introduced Burgess to Bruce Gilbert and Mike Ellison with Coca-Cola's Merchandise Licensing Division.

After hearing the "Fantastic World" pitch, Gilbert told Burgess he was intrigued by the idea of doing a line of Coca-Cola toys. However, Gilbert explained to Burgess that Coca-Cola was not in the business of manufacturing toys; rather, it licensed its trademark to companies for use on merchandise. Therefore, both Gilbert and Ellison told Burgess that before Coca-Cola could proceed any further, Burgess would have to interest a major toy company in his idea. Gilbert and Ellison informed Burgess orally and by letter dated January 12, 1989, that any compensation for the use of his idea would come only from the toy manufacturer. Coca-Cola then introduced Burgess to executives with Kenner Toys in Cincinnati, Ohio.

Burgess pitched his same "Fantastic World" idea to Kenner representatives in February 1989. Initially, they were impressed. The representatives were especially pleased with the cola bears and asked Burgess to develop his ideas further. On March 14, 1989, Kenner made a presentation to Coca-Cola using storyboards developed by Kenner and by Burgess. Coca-Cola liked the presentation, which focused on a line of plush toy teddy bears to be marketed to children between two and ten years of age. On June 14, 1989, the toy idea was again pitched to senior Coca-Cola executives who agreed that Kenner could move forward with its development of the toy line. However, because its products had never been marketed to such young children, Coca-Cola asked Kenner in a letter dated August 18, 1989, to obtain a "seal of approval" from a reputable organization as well as a safety endorsement from an independent company before Coca-Cola would agree to licensing its trademark.

While it worked to satisfy Coca-Cola's conditions, Kenner began negotiations regarding the payment of royalties to Coca-Cola for use of its trademark and to Burgess for his creative efforts. While in the process of finalizing the deal, Kenner began test-marketing the sale of Coca-Cola plush toys, including a teddy bear. The results were surprisingly negative. Consequently, Kenner decided to abandon the project and to release Burgess to pitch his "Fantastic World" idea to other companies. Kenner paid Burgess $25,000 for his efforts on their behalf. There is no evidence that Burgess performed any consulting services for Coca-Cola. Further, Burgess admits that Coca-Cola never reached any agreement with him or with Kenner regarding the payment of royalties.

Burgess presented his "Fantastic World" toy idea to other companies, but they were not interested. From 1989 to 1992, Burgess also continued to contact different Coca-Cola executives, attempting to generate interest in various aspects of his idea, for example, a commercial about an evil character who steals the Coca-Cola recipe. The ideas were all related to the overall "Fantastic World" theme and involved many different characters, including "space aliens" and

"cola kids." The evidence is undisputed that Coca-Cola never imple-
mented, nor contracted with any licensee to implement, Burgess'
"Fantastic World" concept.

In July 1991, Coca-Cola hired Creative Artists Agency ("CAA") of
Hollywood, California, to develop new advertising. CAA was respon-
sible for generating fresh advertising ideas for Coca-Cola's considera-
tion. Coca-Cola executives did not participate in any aspect of CAA's
creative process; they only reviewed the final submissions. One of the
many concepts approved and ultimately made into a commercial was
"Bears at the Theater." This commercial featured a family of anthro-
pomorphic polar bears who were drinking Coca-Cola while they
watched the aurora borealis. The commercial was the idea of Ken
Stewart, the husband of a CAA executive. The evidence shows that
Stewart came up with the idea on his own, free from any input from
Coca-Cola personnel. He was unaware of any of Burgess' ideas. In
fact, Stewart was inspired by his Labrador Retriever puppy, who
apparently looked like a polar bear. Burgess presented no evidence
from which a jury could reasonably infer that Stewart's idea for the
"Bears at the Theater" commercial was created using Burgess' "Fan-
tastic World" concept or any of its parts, including the cola bears.

The "Bears in the Theater" commercial, first broadcast in 1993,
was one of twenty-seven commercial spots aired as part of Coca-
Cola's "Always" campaign. Because "Bears in the Theater" was so
well received by the public, Coca-Cola produced several more com-
mercials focusing on the polar bear family. The success of these com-
mercials prompted several companies to contact Coca-Cola for the
rights to market plush and plastic Coca-Cola CAA polar bear figu-
rines. Coca-Cola eventually agreed to license the CAA polar bear to
several different companies.

Burgess claimed that the CAA polar bear, with its human attrib-
utes and family values, was taken from the cola bears he had envi-
sioned in his Fantastic World. Not only did Coca-Cola adduce evi-
dence showing that the CAA polar bear was independently created
by Stewart, it introduced evidence showing that the use of a polar
bear "spokescharacter" was not novel. First, Coca-Cola demonstrated
a long history of various companies using animated anthropomorphic
animals as product spokescharacters, including Kellogg's Tony the
Tiger, Star Kist's Charlie the Tuna, and Nine Lives' Morris the Cat.
Walter Maes, an advertising executive with 27 years of experience,
explained that anthropomorphic characters have been used in the
industry for decades and that there is nothing novel about such
spokescharacters generally. Second, Robert Vianello, a professor of
film and television, pointed out that anthropomorphic bears have
been put to a number of commercial uses predating Burgess' disclo-
sure of his idea to Coca-Cola. For example, the Icee Company has had

an animated polar bear representing its frozen drink products since the 1960s. Such widespread use of anthropomorphic bears was further evidenced by the book, Teddy Bears in Advertising Art. Third and finally, Coca-Cola has used anthropomorphic bears, including polar bears, in its own advertising on many occasions since 1923. Coca-Cola used an anthropomorphic white bear called "Teddy Snow Crop" to market its Minute Maid frozen orange juice in 1961. It has also licensed the use of its "Enjoy Coke" logo on a variety of plush animals, including bears.

1. (a) To survive summary judgment on a claim for wrongful appropriation of or for conversion of an unpatented or unpatentable idea or product, a plaintiff must adduce some evidence from which a jury may infer the existence of each of these essential elements: "1) the idea must be novel; 2) the disclosure of the idea must be made in confidence; 3) the idea must be adopted and made use of by the defendant; and 4) the idea must be sufficiently concrete in its development to be usable." (Citation and punctuation omitted.) *Jones v. Turner Broadcasting System*, 193 Ga. App. 768, 769 (389 SE2d 9) (1989). Burgess argues that the CAA anthropomorphic polar bear featured in Coca-Cola's "Always" campaign was an unauthorized use of the cola bears element of his "Fantastic World of Coca-Cola" concept. However, even if Coca-Cola had made use of Burgess' cola bears idea, which the evidence does not support, Burgess' claim fails because using an anthropomorphic polar bear to sell a soft drink is not a novel idea.

As we have held:

> To be novel the concept must be peculiar and not generally available or known to others in the trade. To be protected, an idea must possess genuine novelty and invention, which it cannot have if it merely is an adaptation of existing knowledge, albeit a clever, useful, or sensible adaptation.

(Citations omitted.) *Jones v. Turner Broadcasting System*, 193 Ga. App. at 769. Coca-Cola demonstrated that anthropomorphic bears, including polar bears, had been used to sell a number of products, including its own, decades before Burgess ever pitched his "Fantastic World" concept. In short, it was simply a variation on an existing theme. That Burgess' cola bears were presented in a fresh or different setting does not constitute novelty because "creating a new and better way of doing something" already existent is not sufficient. (Citation and punctuation omitted.) Id. "Without the element of novelty [Burgess] was deprived of an essential element entitling [him] to recover." Id. at 769-770.

(b) Further, even if Burgess' concept was novel, he is not entitled

to recover when the unrebutted evidence shows that Stewart and CAA created "Bears at the Theater" on their own initiative, by wholly independent means, and without any input or information from Coca-Cola or Burgess. See *AEB & Assoc. Design Group v. Tonka Corp.*, 853 FSupp. 724, 734 (S.D. N.Y. 1994). Because Coca-Cola is entitled to the complete defense of "independent creation," the trial court properly granted summary judgment on this claim. See id.

2. Each of Burgess' remaining claims depends upon his nonnovel idea acting either as consideration for a promise between Coca-Cola and himself or as a benefit conferred upon Coca-Cola. As we have held, however, under these circumstances,[1] nonnovel ideas are insufficient "to serve as consideration for a promise of confidentiality[2] or as a basis for asserting unjust enrichment." (Punctuation omitted.) *Morton B. Katz & Assoc. v. Arnold*, 175 Ga. App. 278, 280 (2) (333 SE2d 115) (1985). Burgess' remaining claims fail as a matter of law because nonnovel ideas do not constitute protected property interests under Georgia law. Id.; *Wilson v. Barton & Ludwig, Inc.*, 163 Ga. App. 721, 723-724 (296 SE2d 74) (1982). Therefore, nonnovel ideas are inadequate as consideration, and "when one submits [such] an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced." *Downey v. Gen. Foods Corp.*, 31 NY2d 56, 61 (286 NE2d 257) (1972) (claims for breach of express and implied contract insupportable absent novelty). Similarly, because a nonnovel idea confers no benefit upon the defendant, claims based upon quantum meruit and unjust enrichment for a defendant's alleged use of the idea must fail. See *Morton B. Katz & Assoc. v. Arnold*, 175 Ga. App. at 280 (2). And, because nonnovel ideas lack value sufficient to create a property interest, the unauthorized use of another's nonnovel idea would not result in an injustice, a necessary element in a promissory estoppel claim. *Fidelity &c. Co. v. West Point Constr. Co.*, 178 Ga. App. 578, 579 (1) (344 SE2d 268) (1986) (ele-

---

[1] We do not address those circumstances where a nonnovel idea may have substantial value to a particular buyer who is unaware of it and therefore willing to enter into a contract to acquire and exploit it. See *Apfel v. Prudential-Bache Securities*, 81 NY2d 470 (616 NE2d 1095) (1993). In this case, there is no evidence that Burgess' idea was disclosed to Coca-Cola pursuant to such an agreement. Further, the evidence in this case reveals that Burgess' idea was both nonnovel in the abstract and nonnovel to Coca-Cola.

[2] There is no evidence that a confidential relationship as defined in OCGA § 23-2-58 existed between Coca-Cola and Burgess prior to his disclosing his "Fantastic World" concept. As we have held,

> the mere fact that two persons have transacted business in the past based on oral commitments or understandings and that they have come to repose trust and confidence in each other as the result of such dealings is not sufficient, in and of itself, to warrant a finding that a confidential relationship exists between them within the contemplation of the Code section.

*Kienel v. Lanier*, 190 Ga. App. 201, 203 (2) (378 SE2d 359) (1989).

ments of promissory estoppel). Therefore, Burgess' claim for promissory estoppel must also fail. See *Morton B. Katz & Assoc. v. Arnold*, 175 Ga. App. at 280 (2). In fact, under these circumstances, "[l]ack of novelty in an idea is fatal to *any* cause of action for its unlawful use." (Citation and punctuation omitted; emphasis supplied.) *Downey v. Gen. Foods Corp.*, 31 NY2d at 61; *Murray v. Nat. Broadcasting Co.*, 844 F2d 988, 993 (2nd Cir. 1988). Consequently, we find no error in the trial court's grant of summary judgment to Coca-Cola on Burgess' remaining claims.

*Judgment affirmed. Andrews, P. J., and Ruffin, J., concur.*

DECIDED JUNE 30, 2000 —
RECONSIDERATION DENIED JULY 17, 2000 

*Doffermyre, Shields, Canfield, Knowles & Devine, Robert E. Shields, Kenneth S. Canfield, Kilpatrick Stockton, Joseph M. Beck, George W. Austin III, Charles Henn, Jr., Robert Altman*, for appellant.

*King & Spalding, Louis N. Jameson, Courtland L. Reichman, Joseph B. Haynes, Elizabeth F. Johnson*, for appellee.